May it please the Court, my name is Scott Martin. I represent Mr. Williams in this appeal of the 92-month sentence of imprisonment that he received upon his conviction for being a felon in possession of a firearm. This appeal concerns the District Court's application of the firearms guideline section 2k 2.1. At sentencing the District Court applied a two-level enhancement under subsection b1a of that guideline on the ground that the offense involved three firearms and also a two-level enhancement under subsection b4a on the ground that one of the three firearms, which specifically a Ruger .22 caliber revolver, was stolen. Mr. Williams challenges both enhancements on the same ground. He argues that the District Court clearly erred when it found that he constructively possessed the stolen revolver, which was found underneath a dresser in the bedroom of someone else's apartment. Your Honors, what's the law here? Well, when determining how many firearms were involved in an offense, a District Court should include only the firearms that were unlawfully sought to be obtained, unlawfully possessed, or unlawfully distributed. Possession may be actual or constructive. To prove constructive possession, the government must prove by a preponderance of the evidence that the defendant exercised ownership, dominion, or control over the firearm or the premises in which it was discovered. Jointly occupying a space is insufficient to show constructive possession. In cases of joint occupancy, like in this case, the relevant question is whether there was evidence supporting a plausible inference that the defendant had knowledge of and access to the item. In this case . . . That is the test the District Court applied, though, right? The knowledge requirement? Yes, Your Honor. That's . . . we believe that's what the It recited the correct standard. He did recognize it was a joint occupancy. You're just saying he applied it incorrectly. Incorrectly, yes, Your Honor. That's our position. What happened in this case is our client, Mr. Williams, brought four friends to an apartment in Houston. This was not Mr. Williams' apartment. A man named Charles Watson lived there by permission of the lessee, whose name was Jason Goff. Watson apparently gave Williams permission to hang out. Is there any evidence about other times that he was a frequent user of this apartment, a relationship extended back, and this was more or less his room, or something like that? Your Honor, I don't have any . . . In the PSR, it says that Watson stated that the defendant was the only person that should have been in the apartment, but the defendant would bring his friends to Mr. Williams had permission, some kind of permission, from Watson to be there himself, and that Watson knew that Williams would bring friends there, so . . . What do you mean by be there? That wasn't fleshed out in the district court. Hang out is what I think is the . . . Hanging out and hanging together today has all kinds of were hanging out at the apartment, and unfortunately, some of Mr. Williams' friends brought guns. His friend . . . He had a friend named Michu who brought a Tech-9, which is a 9mm pistol with a large magazine, and he let Williams handle that gun. Williams went out on the balcony with that gun. He's admitted to that. His friend Chris had a .40 caliber pistol. There's no evidence that Chris let anybody handle that gun, but apparently Chris was firing this off the balcony at some point. Police responded to a report of gunshots. When the police arrived, they saw Williams out on the balcony, our client, holding a large firearm, which we now know was the Tech-9, 9mm. Everybody ran back in the apartment. Somebody broke a window, and everybody ran. Our client, Mr. Williams, threw the Tech-9 onto the bed. So when the police went into the apartment, they found the Tech-9 on the bed in the bedroom. They found a Davis .380, a .38 caliber pistol, on a couch in the living room. They found a Ruger .22 revolver underneath a bedroom dresser, which is . . . that's the gun that's the subject of this appeal. They have found assorted ammunition in the apartment, including .22 caliber magazine and some unfired bullets, but it's unclear where they found the ammunition. They never found the .40 caliber gun that Chris was firing, so they never found that gun. Our argument is the government failed to provide any evidence about the .22 revolver, other than the fact it was found there? Yes, we have a police photograph. I understand that. I've got them. My question is, does anyone have any evidence as to the . . . from the revolver itself, that is, it's where it came from, or was purchased, or anything about it? The ATF discovered that it was stolen, so we do know that it was stolen, but we don't know who it was registered . . . who owned it, or anything like that. The only thing the record shows is that it was stolen? Stolen, yes. From somebody? Right. So, we don't know who it belonged to. So, we've got . . . we've got the . . . our argument is the government didn't present any evidence supporting an inference that Williams knew about the revolver, and the government's basically asking us to . . . to speculate that he knew about it. You can see the photograph, Defendant's Exhibit 1, which is Record on Appeal, page 106. We think that that's the most natural lighting. It's not . . . that's before they set up the little number cards. It shows there's a gun. If you look hard, you can see the outline of a gun, but it's in a shadowed area by a sneaker. You have to look pretty hard to see it. And, although from the photographer's perspective, you can see it, the government failed to present any evidence that Williams, when he was standing in the bedroom, would have had a similar view of the dresser and the items beneath it. And, in fact, the District Court, in this case, did not make any explicit finding that the gun was in plain view. I'm looking at the photograph, two photographs, and one of them, the lamp has been turned over and put down out of place in order to take the picture. Your Honor, my understanding of this, it appears that the lamp turned on the floor, which is the first picture, Exhibit 1. That is most likely what it looked like when the police arrived. And then, if you look at Exhibits 2 and 3, they've got the number cards set up, and it looks like they flash-lighted the area for the photograph. The record shows that that lamp was over on its side like that when the police arrived? I don't think the record says one way or the other, other than the photograph, Your Honor. Well, my question is whether or not that lamp was put down there in order to take the picture. It may have been. It may not have been, Your Honor. I don't know. And I don't think the record, other than the photograph, I don't think the record says anything about the placement of the lamp, other than that's the way. But it appears that it was not in the second photograph. That's correct. And it looks like the second photo is a little closer up. The inference is that the lamp was put down there to take the picture, because the second picture is out. Take one with and one without. That could be one way of looking at it, Your Honor. One way of looking at it is that there's one with and one without. But the inference you draw from that is something else. Your Honor, I don't know anything specific about the placement of the lamp, other than the way it appears in this picture right here. But I do know that looking at Exhibit 1, it's awfully difficult to, unless you're actually looking for a gun, and you're looking hard for a gun, it's very hard to make out where the gun is in Defendant's Exhibit 1. Your Honor, I'd also like to point out that... You don't know if that ammo on the top of the dresser is for the gun underneath? In Exhibit 2, Your Honor, we don't know what gun that ammo goes with. The record doesn't say anything. Well, it's not a .22 cartridge for sure. It looks pretty large. I would think it would be something of a larger caliber. I'm not an expert on this, but I would say that it would not appear to go with the revolver. Your Honor, in Mr. Williams' post-arrest statement to police, he did discuss a .40 caliber pistol, the one that Chris brought, and a gun with a large magazine, which we know is the Tech-9. He didn't mention anything about a .22 revolver, which we think goes further towards our argument that he had no knowledge of the revolver that was under the dresser. This case is... Maybe that's because it's stolen, right? He doesn't want to claim the stolen one. There's a plausible explanation why he might have been honest about the others and not that one. Well, I suppose that's one potential way of looking at it, but I think a stronger view of it is that he didn't know about it. He was speaking freely about these other guns that were in the apartment. I don't think that he would be thinking of sentencing enhancements in a potential federal case at the time he was speaking. But a stolen gun is much more problematic. Forget sentencing enhancements. Everyone knows a stolen gun is much more problematic. You cite a number of cases where we found a lack of evidence to support constructive possession. Are any of those cases in which it was clear that the defendant knew about some of the firearms in the house, but yet the court concluded there wasn't enough evidence that he knew about another one? Yes, Your Honor. Sealy is an unpublished case from 2016. The defendant was in the living room of a house when police executed a search warrant. There was a gun within his reach, and the court found that he admitted to that gun. He had possession of that gun. But there were also guns that were found in a bedroom, kitchen, and a hallway closet. And the court found that the defendant not actually or constructively possessed those other firearms because, quote, nothing in the PSR suggests that Sealy ever carried or handled these three firearms. Nothing suggests that the defendant even knew these firearms, too, which were hidden from view, existed. So our argument here is that here, like in Sealy, nothing suggests that Williams ever carried or handled or knew about the .22 revolver under the dresser. Your Honors, if there is not any more questions, I will reserve my time for rebuttal. All right. Thank you. Thank you. May it please the Court, Loretta Berry for the United States. It is plausible to infer under these facts that Williams had carte blanche access to this apartment and he invited his four friends over for a shooting party. Judge Lake did not clearly err in including the stolen Ruger in the enhancement for three or more firearms. A .22 revolver is a different genre than these other weapons they have. They have .44 calibers that attack guns. A .22 caliber is a, you know, that's a throwaway for these kind of guns. I mean, it's not a similarity, but in terms of it's just different and it's perfectly consistent to me that they were displayed to all the other guns and they threw them down. They didn't hide those guns, did they? Well, Your Honor, first to answer your question about the type of gun, the enhancement doesn't say that, you know, doesn't specify what different types. Oh, I understand that. Okay. Well, in terms of Judge Lake had a different view of how these guns were distributed and his view is equally plausible with what you're saying about the way they were displayed. And that is that in the PSR, William states that as soon as he saw the police, everyone panicked in the party. All five people panicked and ran inside the bedroom. So it's plausible that when they ran inside the bedroom, the Davis pistol was tossed on the living room couch, the Intratec pistol was tossed on top of the bed with the magazine, and perhaps the Ruger was tossed a little bit better than the other two. But from Exhibits 2 and 3, it is still plausible that it's plainly visible sticking out from underneath the dresser and not tucked up underneath the dresser. It's plausible, too, that if you look at the top in the defendant's brief, they said that the ammunition was hidden. Is possibility enough? Under the standard of clear air, if two constructions of the evidence are possible, the court's choice between the two is not clear air. And in this case, it's plausible to infer because he had carte blanche access to this apartment, the unrebutted facts in the PSR show that Watson, who was the sole resident, told investigators that the only person who should be there is Williams, but he knew that Williams would bring friends over to hang out. And in his post-arrest statement, Williams tells the investigators that he went over to the apartment after he left his baby mama's house and his poor friends with guns came over. So it's plausible that he had a key to let them in. He was a regular at this apartment. And from his post-arrest statements, Your Honors, he knew of and had access to actually four guns. Only three are necessary for the enhancement. But he admitted in the PSR that his friend Chris had a .40 caliber pistol and he shot the pistol. The residue was found, or the casings were found outside the apartment. There's residue on Williams' hands from being close to a discharged firearm. He admits that he tried to fire the Intratech with his friend Michi, but that gun was jammed. Then again, he states that when he spotted the police on the balcony, everyone panicked and ran inside the bedroom. Again, the Intratech is on the bed. What is the sentence without the handgun? Without this handgun, I believe the record would show there would still be three weapons. Right. What's the difference? You would have a minus two. If you're correct, if we found that this particular .22 caliber revolver was not constructively possessed, what's the effect on the sentence? There would be a not constructively possessed. We would still, again, Your Honor, I believe under these facts, still have three weapons. But there would be an error for the minus two for the stolen Ruger. And that would translate to what? A two-level reduction and it would be a different guideline range. But you don't know what that is? I don't have it in front of me, Your Honor. I can't do the math as quick in my head, I'm sorry, but it's in the briefs. I'm sorry, I can't do the math that quick. But it would be a two-level reduction. And so it would not be within the range that the court sentenced him to. Everything you've just been saying about the incident, they're out there shooting guns on the balcony and all that's very troubling. Given the discretion district judges now have, the reason they have that discretion is that maybe the sentence shouldn't turn on, well, did they actually see this little part of the gun that you can see from the dresser or not? I mean, you look holistically at everything, but it just doesn't seem that the technicality of whether this one gun of the handful should be attributed to him should make a difference in the sentence. But I know you're not arguing harmless error, and it was a guideline sentence, so the judge did rely on the guidelines. That's correct, and he mentioned that at record page 93, that the guideline sentence would be applied in this case at the low end. And as you mentioned, Judge Costa, this court's review is highly deferential to Judge Lake, and it's a fact-finding determination. So even if two reasonable constructions exist, Judge Lake's choices between the two cannot be clear error. Under record 93, he stated that he considered all the evidence in this case. He didn't need to specifically . . . You say he had access to the place. I'm trying to understand exactly what that is. Did he spend the night there? Did he stay there, so to speak? No, but you know . . . Or just come by and visit? I don't understand. Well, did you say about the light, Your Honor? I'm sorry. Well, I'm not asking about the light. I'm asking what this defendant's relationship was to this particular apartment. The counsel opposite said he didn't know. My question is, when he said they had a right to be there, and sometimes to hang out there, what does that translate to? Did they spend the night there? Were they there? How frequently were they there? Is this a sometime thing? I don't have a sense of that. Well, it wasn't developed too much in the record, but here's what we can infer in the PSR, is that Watson, who was the resident, was not there at the time of the shooting, and he told investigators that the only person who should be there is Williams, but he knew, and I quote, Williams would bring friends over to hang out, which suggests that it's not an isolated occurrence, and I think that's a stronger plausible inference when you consider the post-arrest statements that Williams said, that he went over to the apartment after he left his baby mama's house, and his four friends with guns came over. So it's plausible for Judge Lake to infer that he had a key to let his friends in, because the sole resident wasn't there, and that he was perhaps a regular at this apartment. It wasn't an isolated event. Well, if he had a key to get in, I think he had a key to let other people in too. Exactly. Yes, sir. Yes, Your Honor. Is there any evidence, though, that he stayed in this bedroom, slept there ever? No, Your Honor, there is none. Given the highly deferential review of this court to Judge Lake's fact-finding, he considered all the evidence in the record, recognized the correct standards of review, it's plausible in light of the totality of the facts that Williams knew of and had access to this Ruger. You're talking about plausible, that's not the word you used earlier, or possible, possibilities. If the gun had, I mean, a possibility is he did a better job of throwing this particular handgun under the dresser, and it couldn't be seen at all, would Judge Lake have been entitled to say, well, that's the possibility, and that even though he couldn't see it standing up, maybe he threw it under there, or maybe Watson did, or whatever the owner is? Where does this possibility, which is pure speculation, it seems to me, where does possibilities end? I mean, you've got a somewhat better case that if you look real hard, then maybe the weapon can be seen. Is that even necessary in your view? I think under these facts, it is necessary that there is some view. Why? What's wrong with my possibility analogy to what you're talking about? Well, there are the cases that cite that there is no knowledge are when they're completely hidden from you, tucked under a mattress. Well, there'd be a possibility, you know, if there was not any other gun there, and it was hit back under, well up under the thing, no one could see it undisputed. But it's possible that he hid it. I mean, it is possible. I'm troubled by this. Well, it's possible, so the district court has discretion. I'm sorry, but a district court, just because something's possible, it will not sustain the finding that it enhanced the criminal sentence.  under these facts, it's hard to show that a definite and firm conviction that error has been made when you consider the entire context of this situation that he admits to at least three guns, even without the Ruger, three guns that were involved in this offense, and all of the ammunition that's found in this apartment is a perfect match for all four of those weapons. When you consider the totality of all of those... Yeah, 22 caliber. Excuse me? There were 22 caliber ammunition there as well. Yes, that was recovered as well. The PSR specifically lists out all of the ammunition for all four guns, Your Honor. It doesn't say where it was recovered or if it was... We do know that there is a visible box of ammunition on Defense Exhibit 2 that doesn't match it, but it is clearly visible to put someone on notice that there's firearms in that room. And it's important to note, too, that this Ruger's in the very room that he was in. On that picture, if I looked at that picture, the cartridges that are on top of that are clearly not 22 caliber. Now, there may be some that I can't see. That's correct. That's correct. It's not 22 caliber. To my rough eye, that's a 44 caliber. But it puts someone on notice that there's probably guns in the apartment in the case law that we cited. And he... Yeah, they don't notice the guns in the apartment. They threw down guns, including a 44 caliber. It's admitted they were there. That's not speculative. No, it's not speculative. But under the case law that we cited in our brief, the positioning of ammunition out plainly visible puts someone on notice that it's possible that the guns are there, that guns would be located in that same place. And in Williams's brief, he said none of the ammunition was recovered and none of the ammunition was visible. But it is visible on Defense Exhibit 2 on top of the dresser. The standard for Judge Lake was preponderance of the evidence but not beyond a reasonable doubt as well. How do you distinguish that Seeley case the other side mentioned where the person did have some guns but we said you shouldn't hold him accountable for everything in the residence? I would distinguish the Seeley case, Your Honor, because in this case, he actually handled at least three guns. And that's all that's necessary for the enhancement. He did handle the... He constructively possessed the .40 caliber. He admitted to that. He admits to the Intratec. He admits to the Davis pistol. That's how I would distinguish those cases, Your Honor, is because he admits to at least handling three of these weapons. And it is plausible given the totality of the facts that he knew of and had access to this stolen river. But it happens that the... the color stolen actually is four points. If you take the... It did count for four points, I thought. Well, the stolen aspect is a plus two, Your Honor. That's a plus two enhancement. But then the third, that was counted as the third in the PSR, so that's what got that additional two. Correct. But there is... But he also admitted to at least... Did you argue in your brief that the three-gun enhancement didn't matter because of his admission? No, because the .40 caliber... I didn't. I wish I had argued that, Your Honor, but I put it in the facts in the brief. It is in the facts that in the argument section as well that he knew about several different firearms and I calculated them out. I listed them out in the brief. But I would still need to... We would still need to establish that the river was involved in order to get the stolen enhancement on top of that. Where was the .22 caliber ammunition when it was seized? That is not in the record, Your Honor. I don't know. So we don't know where it was in the apartment? We do not know. But we know the .40 caliber casings were outside. We know that he tried to fire the intertech but it was jammed. We know that some  but the .22 was not recovered. Anything else, Counsel? If there are no further questions, I respectfully request the Court affirm the judgment. Thank you. Your Honors, the standard here, although it's clear error, the government still has to prove the facts by a preponderance of the evidence. So that's an important thing here. It's not whether something's possible. It's whether the government has proven it. The standard, opposing counsel has talked about whether Mr. Williams was on notice. Well, this is not a negligence standard. We're asking here whether there's evidence supporting a plausible inference that this defendant had knowledge of and access to the item. It's not this notice standard. I think it comes from an out-of-circuit case that she cited in her brief, which is not the, no Fifth Circuit case had said anything about notice. Another question. Did your client have any of his clothing in the apartment? The record doesn't show one way or the other. Whose sneakers were those beside the gun? Whose sneakers were those beside the gun? Your Honor, the record doesn't say. It's not in the record. I think a fair inference is that the sneakers belonged to the person who lived there, Mr. Watson. Is that clear that Watson actually lived there? It is clear from the PSR that that's where Watson lives, and he was at work that day. Someone else actually was on the lease, though, right? Someone else was on the lease that hadn't lived there for about a month. Do you think Watson was there? Watson is the adopted brother of the lessee, and so he let Watson live there. Watson apparently let Williams go there to hang out. Now, opposing counsel has said something about a key. There's no evidence of a key. We don't know whether Watson locks his door or not. Also, about Chris's .40-caliber gun, although Williams certainly had knowledge that Chris had a .40-caliber pistol that he was out shooting, there's no evidence that Chris ever shared his .40 with anybody else, so we don't know that Watson had access to Chris's .40-caliber pistol. Is there no evidence as to whether all the weapons but the .22 were brought into the apartment by the people who came there to visit that day? I think that's a fair inference, that all those weapons came with the people who came that day, Michi, Chris, and the others, but that the Ruger was likely there in its normal place. That's my take on it. Your inference would also need to extend, it seems to me, to make this all commonsensical, that all that ammunition was brought as well, which includes ammunition that only goes to the Luger, right? Well, I think we don't know where the ammo was. I would think that if someone had a Ruger there, that they would have the ammunition somewhere in the apartment as well. So potentially that ammunition was not brought in that day. A question was asked about what the guideline range would be if there were only a two-level reduction, it would be 77 to 96 months. What about her argument that this is only about that two-point enhancement for the stolen weapon because even without the Ruger, he admitted to possessing three? Okay, this goes back to what I was talking about a minute ago with Chris's .40. Although there is evidence that Mr. Williams had knowledge of the .40 pistol, .40 caliber pistol, there's no evidence that Chris, who had the .40 caliber pistol, gave Mr. Williams access to it. For all we know, Chris doesn't let anybody handle his .40 caliber pistol and Chris seems like he might be a pretty bad dude also so I probably wouldn't want to take it from him. So, the government is asking this court to make a lot of speculation in this case and our position is the government just simply hasn't met its burden on either enhancement and that the correct guideline range should be 63 to 78 months and the 92 month sentence that was imposed in this case is a full 14 months higher than that and the court did not say it would impose the same sentence for the same reasons under the correct guideline range. So, Your Honors, we ask you to remand for resentencing under the correct guideline range. Thank you.